OLGA B. BOTTOMS *vs.* MANUEL J. CARLZ & another.

Essex. May 14, 1941. — September 11, 1941.

Present: FIELD, C.J., DONAHUE, DOLAN, & RONAN, JJ.

*Adoption. Parent and Child. Guardian,* Of minor. *Minor. Probate Court,* Report of material facts, Appeal, Decree. *Words,* "Unfit."

Upon an appeal from a probate decree and the filing, under G. L. (Ter. Ed.) c. 215, § 11, of a report by the judge of material facts found by him, there can be no implication of further facts.

The status of adoptive parents of a minor established upon a probate decree under G. L. (Ter. Ed.) c. 210, § 6, is that of natural parents and they cannot be deprived of the minor's custody without their written consent unless, after notice and hearing, they are found to be "unfit" under G. L. (Ter. Ed.) c. 201, § 5.

A finding, that a man and his wife, who under G. L. (Ter. Ed.) c. 210, § 6, had adopted a child six months of age when the adoptive father was a retired fisherman sixty-nine years of age and his wife was an invalid sixty years of age, had become during the next six years so "unfit" to have further custody of the child as to warrant a probate decree under c. 210, § 5, appointing the child's natural mother as his guardian with custody, was not warranted where it appeared that there had been no material change in their condition other than that due to the natural passage of time, that they were "morally, intellectually, and religiously . . . all that" could be desired, that their home was neat and clean and that the child was well fed and well clothed.

The circumstances leading to a decree of adoption of a minor child could not be considered as affecting the consequences of the decree in a subsequent proceeding by the natural parent against the adoptive parents for custody of the child.

PETITION, filed in the Probate Court for the county of Essex on August 31, 1940.

The case was heard by *Phelan,* J.

*A. B. Cohen,* for the respondents.

*C. H. Parsons,* for the petitioner.

DOLAN, J. This is an appeal from a decree entered in the Probate Court, appointing the petitioner guardian with custody of the person of Edward Albert Carlz, the minor child by adoption of the respondents Manuel J. and Mary A. Carlz. The evidence is not reported but the judge made a report of material facts found by him, at the request of the respondent appellants, under the provisions of G. L. (Ter. Ed.) c. 215, § 11.

Material facts found by the judge are as follows: The child was born to the petitioner, who is now twenty-four years of age, on June 22, 1934. The respondents are her "uncle" and "aunt." She was brought up from childhood, together with her brother and the two sons and daughter of the respondents, in the respondents' home in Gloucester, where they own and occupy, in part, a three-tenement dwelling. The respondent Manuel was a fisherman, and comfortably supported his own family as well as the petitioner and her brother. Due to an injury, received in 1930, Manuel, who is now seventy-five years of age, retired, and since that time has been unable to do any work other than chores about the house. His wife, the respondent Mary, who is sixty-six years old, has been confined to her bed for the past seven years by reason of an illness which appears to be "permanent." The present members of the household are the respondents, their daughter Viola Carlz, who is thirty-three years of age, and the child Edward.

The petitioner was a high school student, seventeen years of age, when she gave birth to the child. After his birth his putative father was complained of in the District Court, where a finding of paternity was made. Pending an appeal taken by him counsel for the respondents told them in the presence of the petitioner that, in order to effect a monetary settlement, it would be necessary to procure a decree of adoption. The respondents agreed to adopt the child at that time and said "that they had always taken care of the petitioner and that they would continue caring for her and her child, and that if at some time in the future she was married

or had a home of her own, she could always take the child, and that it was always to be her child." The respondents' petition for adoption of the child was allowed on January 9, 1935.

The petitioner continued up to October, 1937, to live in the home of the respondents with the child, who occupied the same room with her and the respondents' daughter Viola, and took full charge of him with the exception of short periods when she was employed, during which the respondent Manuel cared for him in the daytime. In October, 1937, the petitioner married one Benjamin Bottoms, "a first class radio operator in the United States Coast Guard," and "lived in the immediate neighborhood for five months thereafter, calling daily at the respondents' home to care for the child. At the end of this time, being in ill health, she visited the home of her mother-in-law in Atlanta, Georgia, and remained there until the latter part of July, 1938, when she returned to Gloucester, and took up her residence with her husband in the home of the respondents." The child occupied the same room as the petitioner and her husband. In October, 1939, the petitioner and her husband established a home in Salem. From that time until July 4, 1940, the petitioner made regular visits to the respondents' home to see the child. On that date a discussion arose as to the petitioner's right to "take the child out," and she made demand on the respondent Mary to give the child up. The demand was refused; the petitioner took the child from the house, but upon complaint being made to the police, returned him "immediately."

Since October, 1939, the child has been "occupying the same bed" with the respondents' daughter Viola. She bears an excellent reputation, and is employed as a clerk from 9 A.M. to 6 P.M. She washes and dresses the child and takes him to school each morning. The respondent Manuel prepares the child's lunch at noon, does some housework and assists in the care of his wife. When the child returns from school at 4 P.M. he plays with children of his own age in the immediate vicinity, but is "not [then] under the supervision of anyone in the respondents' home." Viola prepares the

meal for the family at 6:30 P.M. and shortly thereafter puts the child to bed. "The respondents have no means of support other than the net income from the three-tenement house above mentioned, and contributions from their children [other than the adopted child Edward], two of whom are married and live elsewhere." (There is no finding that this income is inadequate for the support of the household.)

The respondents are highly recommended as honorable citizens and "morally, intellectually, and religiously they are all that can be desired." Their home is neat and clean. The child is well fed, and well clothed, and there has been "no material change other than the natural passage of time in the condition of the respondents from the time of the adoption up to the date of" hearings before the judge. The judge, however, found that because of advanced years and physical infirmities the respondents are not as capable of caring for the child as they were of caring for their own children, and that the petitioner "has greater capacity to do for the child than either or both of the respondents, and could exercise more constant supervision"; that the petitioner bears an excellent reputation; that she and her husband are now living in a five-room apartment in a good neighborhood in Salem; that the husband of the petitioner is willing to take the child into his home; that both he and the petitioner have expressed a desire to have him since their marriage; that the respondents and their daughter have "great love" for the child; and that the petitioner "now has and always had love for . . . [him], and to the best of her ability acted as any natural mother would act under all the circumstances." In conclusion the judge found on "all the evidence and the inferences to be drawn therefrom, having in mind the present and particularly the future welfare of . . . [the] child . . . that the respondents are 'unfitted' within the meaning of the statute."

Since the evidence is not reported the only question presented is whether the decree entered was warranted by the material facts reported by the judge under G. L. (Ter. Ed.) c. 215, § 11. Such a report is regarded as a finding of all

the material facts on which his decision was founded, *Topor* v. *Topor*, 287 Mass. 473, 476, and therefore "there is no room for any implication of further findings." *Birnbaum* v. *Pamoukis*, 301 Mass. 559, 562.

By virtue of the decree of adoption, with exceptions not here material, all rights, duties and other legal consequences of the natural relations of parent and child thereafter existed between the respondents and the child, and all such rights, duties and legal consequences between the child and his natural parent were terminated. G. L. (Ter. Ed.) c. 210, § 6. The status of the respondents was thus established by the decree of adoption, and the circumstances attendant upon the procuring of the adoption cannot be considered to cut down the legal consequences following the entry of that decree, which cannot be attacked collaterally. *Wilbur* v. *Hallett*, 305 Mass. 554, 558, and cases cited. It follows that the respondents stand in the eye of the law as if they were the natural parents of the child within the meaning of G. L. (Ter. Ed.) c. 201, § 5, under the terms of which the custody of his person could not be awarded to the petitioner as decreed except upon the written consent of the respondents, unless, after notice and hearing, the judge found that they were "unfit" to have such custody.

We are of opinion that the material facts found by the judge did not warrant the entry of the decree giving the custody of the child to the petitioner. The present case is governed in principle by *Richards* v. *Forrest*, 278 Mass. 547, where at page 552 the meaning of the word "unfit" in the governing statute is fully considered and where it is said to be a "strong" word, and that as applied to the relations of parents to their child it "usually although not necessarily imports something of moral delinquency." In the instant case no moral delinquency on the part of the respondents is shown. On the contrary it is expressly found that "morally, intellectually, and religiously they are all that can be desired."

In the *Richards* case it is recognized that in cases such as the present one "the first and paramount duty of courts is to consult the welfare of the child" and that the natural

right of parents to the custody of their child will not be enforced to the detriment of the child (page 553). On the facts found in the case at bar we think it cannot be said that the enforcement of the rights of the adoptive parents of the child, the respondents, to his custody will be a detriment to the child. There are no findings of any such elements of unfitness of the respondents as are alluded to in the *Richards* case in defining the meaning of the word "unfit." In that case at page 554 it is said: "The unfitness of parents in this section of the statute must be determined with respect both to their own character, temperament, capacity, and conduct, and to the welfare of the child in connection with its age, environment and affections."

The findings of the judge establish that the character, temperament and conduct of the respondents are excellent, "all that can be desired." They have "great love for the child." The only limitations upon their capacity as found by the judge are those due to age and physical disabilities. But those existed when they adopted the child, when, by the decree of adoption, the judge who entered it must be taken to have found that the respondents in this case were of sufficient ability to bring up the child with suitable nurture and education, having reference to the degree and condition of the petitioner here. In the present case the judge has found that the only change in condition of the respondents from the time of the adoption to the time of the hearings before him is that due to the passing of time. It is a fair inference, of course, that the physical condition of the respondents has undergone some change in the past six years, but we think that there is nothing in the findings to show that the welfare of the child has been prejudiced thereby. A conclusion that he is not well cared for would not be warranted on the findings. The judge did not so find, but on the contrary made findings that warrant the conclusion that he is well cared for, given devoted love by the respondents and their daughter, well fed, well clothed. There is nothing in the findings to show that he does not return this love. Considering his environment, that of the home is found to be of good character. It is that in which he has

always lived; that in which the petitioner was brought up and in which she was given comfortable support and in which she lived at times even after her marriage. The fact that the child plays after school with other children in the neighborhood, without being supervised by any member of the respondents' household, cannot, in the light of common experience, be said, without more, so to affect his welfare as to constitute valid reason for finding the respondents unfit to have his custody. In view of all the other specific findings we attach no weight to the finding that the petitioner "has greater capacity to do for the child than either or both of the respondents, and could exercise more constant supervision." *Richards* v. *Forrest,* 278 Mass. 547, 554. See also *Commonwealth* v. *Ball,* 259 Mass. 148, 152.

Upon the findings of the judge we are of opinion that it cannot be said properly that any considerations are disclosed "touching the general public good based on the need and advantage of the child" that would warrant depriving the respondents, his adoptive parents, of his custody. *Richards* v. *Forrest,* 278 Mass. 547, 553.

The decree entered in the Probate Court is reversed and a decree is to be entered dismissing the petition.

*Ordered accordingly.*