Stanley W. WRIGHT, Jr.

v.

**SUPERINTENDING SCHOOL COMMIT-
TEE, CITY OF PORTLAND, and
City of Portland.**

Supreme Judicial Court of Maine.

Jan. 28, 1975.

Nixon & Corson by David J. Corson, Yarmouth, for plaintiff.

Charles A. Lane, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

POMEROY, Justice.

Appellant was a tenured teacher in the public school system of the City of Portland, having had 12 years service. At all times material hereto he was also a federally licensed gunsmith and the holder of a concealed weapons permit.

It is the fact he was attempting to perform the functions of a gunsmith during the same time he was charged with performing the duties of a teacher that brought this law suit into being.

This appeal is from the denial of a complaint filed in the Superior Court pursuant to the provisions of Rule 80B, M.R.Civ.P., which attacks the action of the Superintending School Committee of the City of Portland in dismissing appellant from his position as a teacher because of the Committee's conclusion he was *"unfit"* to teach in the Portland school system.

Purported authority for the Committee's action is Title 20 M.R.S.A. 473(4) which reads in material part:

"After investigation, due notice of hearing, and hearing thereon, they shall dismiss any teacher, although having the requisite certificate, who proves unfit to teach or whose service they deem unprofitable to the school; . . .."

The Justice below concluded there was no contested issue as to the facts. Rather he saw the sole issue as "whether the facts justify a finding of 'unfitness' and the punishment of dismissal."

To use his words,

" . . . the question is whether the Court, under these circumstances can *second-guess* the statutorily and constitutionally charged Superintending School Committee in the regular exercise of the prerogatives vested in it under the laws of this State. In other words, can the courts substitute their judgment for that of the Committee where there is no question as to the facts found, no question of due process, no question of the regularity of the proceedings, and the only issue is whether the Committee in the particular circumstances of the case, used poor judgment or reacted in excess of the necessities of the occasion."

He then proceeded to rule:

"So under these circumstances where 'fitness' is a word of such broad meaning, the determination of 'unfitness' is herein limited, cannot be said to be clearly and manifestly wrong and the School Committee is entitled to have its decision upheld in the absence of manifest error."

He then directed the entry of judgment for the defendants. Such judgment was entered. Appeal therefrom was seasonably taken.

We sustain the appeal.

We do not agree with the Justice below that the issue before him was as he envisioned it to be.

It is true, as the Justice below said, there is no claim of due process violations in the proceedings before the School Committee [1] and there is no question as to the correctness of the facts found.

However, having found those facts, the Board in concluding that "unfitness" within the meaning of 20 M.R.S.A. 473(4) was demonstrated, creates a question of law erroneously resolved below.

The factual setting of this dispute may be summarized briefly as follows:

January 11, 1972, was an extremely cold day in Portland. Appellant was suffering the lingering effects of a bout with pneumonia. Despite the weather he felt obliged to go to work at the Lincoln Junior High School in Portland, and teach his classes. For a long time prior to this date appellant had made gun repairs for a Portland retail store. Quite regularly, three times each week after school hours, he had gone to the store to pick up those guns which were to be repaired by him, and taken them to his home. After the repairs had been made he returned them to the store.

It had long been his habit on those days to carry a revolver for his own personal protection. That he was legally authorized to do so is not in dispute.

On the morning in question appellant had a revolver and ammunition in separate pockets of a ski jacket which he wore over his suit as protection against the extremely cold weather. It was not until he hung the

---

1. The conduct of the proceeding before the School Committee was a model of excellence for quasi-judicial proceedings before an administrative tribunal. The specification of charges served on defendant was specific in detail. The defendant appeared and was represented by competent counsel. The presiding officer at the hearing was an able, experienced lawyer-member of the Committee who conducted the hearing with scrupulous regard for the rights of all parties.

jacket in a small alcove in the classroom in which he taught that he realized the presence of the gun and shells. Debating with himself as to whether to leave them in the jacket or remove the gun and return it to his car, he decided to leave things as they were, believing

> "it was safer there than in my car . . . because in the car it had access to being stolen and I felt that possibly in the school it had a better chance of not being stolen . . . my door locks had been frozen . . . and I had not been able to lock my car."

Although plaintiff checked the jacket during his morning break, sometime just before the close of school that afternoon he discovered that the gun and ammunition were missing. He immediately reported the theft to the School Principal and the police. The following morning in an effort to recover the items himself, appellant announced to his classes that an extremely valuable gun had been taken from his jacket, that it was registered and unsaleable and that a $10.00 bill would be left in a desk drawer in exchange for the weapon, with no questions asked. In this manner the gun was returned by a person or persons unknown. The ammunition was never found.

No claim is made that the appellant lacked sufficient educational training or ability, or that he had been guilty of any moral impropriety or that he had ever, prior to this instance, been the subject of disciplinary proceedings.

In determining the legal correctness of the action taken by the School Committee, and the Justice below in upholding same, we must start with the premise that we are dealing with a tenured teacher who had completed 12 years of satisfactory service as a teacher.

The Superintending School Committee characterized the appellant's conduct in leaving the revolver in his jacket pocket without making arrangements for its secu-

rity or apprising teachers using the classroom of its presence as "a grave lack of judgment on the part of Mr. Wright . . . ." With that conclusion we feel there is little room for disagreement.

The issue then becomes, is it error of law, as a misconception of the meaning of the concept "unfit to teach" in 20 M.R.S.A. 473(4), for a superintending school committee to dismiss a tenured teacher as "unfit to teach" on the basis of a single isolated instance which is the result of "a grave lack of judgment" involving neither moral misconduct, lack of educational training nor ability to teach.

The Justice below in sustaining the School Board's action wrote:

> "The fitness of a teacher to teach in any particular school system involves his adaptability to the needs of that school system and that particular segment of society."

While characterizing the action of the School Committee as "drastic in the extreme," "an excessive exercise of power" and "an over-reaction" stimulated by a current hysteria relating to the carrying of firearms, the Justice nevertheless found such action to be "within the scope of [the Committee's] constituted authority." We must disagree.

We do not suggest that a school board lacks discretion to determine, upon taking into account the special attitudes, problems, and needs of the community, whether or not a teacher is unfit to be employed in that particular school system. However, we do not believe it was the intent of the Legislature that a school board have the power to dismiss a tenured teacher in order to calm a fear of its constituency, absent any evidence that the character or notoriety of the teacher's conduct adversely affects his service to the school.

The subsection of the statute under which the Superintending School Committee purported to act directs the School

Committee to "dismiss any teacher, although having the requisite certificate, who proves unfit to teach or whose service they deem unprofitable to the school; . . . ."

In Hopkins v. Bucksport, 119 Me. 437, 111 A. 734 (1920), this Court had occasion to discuss the meaning of the above-quoted words in the statute. The *Hopkins* Court began its discussion by saying

"The authority given to the committee, to vacate a contract, being an authority given to those who represent one party only, must be strictly pursued according to the provisions of the statute, to have that effect. Searsmont v. Farwell, 3 Me. 450, 453."

They then continued:

"The statute in question authorizes the dismissal of a teacher upon two grounds: Unfitness to teach and failure of practical success in the work of the school, rendering the teacher's services unprofitable to the school. It is evident that these causes may run into each other; yet they are substantially distinct. Unfitness to teach, including in that term moral and temperamental unfitness as well as lack of educational training and ability, may be apparent either before or after the actual work of the school has begun; but failure of practical success in the work of the school can only become apparent after the work has begun. The clause, '*or whose services they deem unprofitable to the school,*' is first found in the Revised Statutes of 1841, C. 17, § 41, Par. 5, in the form, '*or whose services are believed by them to be unprofitable to such school.*' This cause of dismissal was evidently introduced into the statute, to cover cases frequently arising where from some cause it is apparent, after the school has begun, that the teacher's usefulness has become impaired, and that the good of the school requires the dismissal. Such action in vacating a contract can only be justified as for the good of the school, and should

only be taken after notice and 'candid' investigation. R.S.1841, C. 17, § 41, Par. 5." 119 Me. 437, 440, 441, 111 A. 734, 735, 736.

In *Hopkins,* a teacher of seventeen years experience was discharged before the opening of the school year because

"her services in the judgment of said committee would be unprofitable to said school on account of her admitted associations with a German alien enemy of the United States of America, under suspicion and under investigation at this time by the government." 119 Me. 437, 439, 111 A. 734, 735.

The Court found the action of the School Committee to be improper on the grounds that

1) the charge of unprofitability to the school could not be substantiated until after the school year had begun when the teacher's "practical success in the work of the school" could more properly be evaluated; and

2) notice to the teacher was insufficient to apprise her of the grounds on which her dismissal was sought.

While *Hopkins* is the only Maine case which augments the meaning of 20 M.R.S. A. 473(4), there is a wealth of case law from other jurisdictions which construe similar statutory language.

■ In the context of child custody cases, the word "unfit," as it is used in statutes authorizing the termination of parental rights, consistently has been held to mean "unsuitable, incompetent, or not adapted for a particular service." Armentrout v. Jones, 207 Kan. 366, 485 P.2d 183 (1971); Richards v. Forrest, 278 Mass. 547, 552, 180 N.E. 508 (1932); Bottoms v. Carlz, 310 Mass. 29, 36 N.E.2d 379 (1941).

A similar qualification of comptency or suitability for the particular job has been engrafted on that term in cases involving unfitness for the practice of law (In re Gorsuch, 76 S.D. 191, 75 N.W.2d 644

(1956)), unfitness for police duty (Metcalf v. McAdoo, 48 Misc. 420, 95 N.Y.S. 511 (1905)), unfitness for assuming the duties of an executor (McLendon v. McLendon, 96 Ga.App. 197, 99 S.E.2d 489 (1957)), and unfitness for the office of sheriff (State v. Latham, 174 Ala. 281, 61 So. 351 (1910)).

Many courts having occasion to discuss whether or not certain conduct constitutes "moral unfitness" in a teacher, have suggested that the misconduct must in some way impair the teacher-student relationship. See, e. g., Superintendent of Common Schools v. Taylor, 105 Ky. 387, 49 S. W. 38 (1899), (giving assistance on a single occasion to someone taking a teacher's qualification examination held to be conduct not authorizing revocation of a certificate under a statute requiring that the teacher be found "incompetent, inefficient, immoral or otherwise unworthy to be a teacher"); Browne v. Gear, 21 Wash. 147, 57 P. 359 (1899), (irregularities in connection with the taking of a teacher's examination held to be insufficient cause for revocation of certificate); and dictum in Bowman v. Ray, 118 Ky. 110, 80 S.W. 516 (1904), (intoxication in public at a time too remote to affect a teacher's "moral character or competency" at the time of the revocation of his certificate, would be insufficient to authorize revocation).

Where a teacher had admitted to a week's non-criminal homosexual relationship with another teacher, the Court refused to sustain the revocation of his certificate where there was inadequate evidence that such conduct adversely affected his teaching ability or that the publicity surrounding the incident might impair the teaching process. (Morrison v. State Board of Education, 1 Cal.3d 214, 82 Cal. Rptr. 175, 461 P.2d 375 (1969)).

In *Morrison,* the Court reaffirmed prior California decisions stressing that in determining whether certain conduct constituted "unprofessional conduct" consideration must be given to whether or not such conduct has any ascertainable deleterious ef-

fect on the quality of the teacher's professional performance. Whatever else language like "immoral conduct" or "unprofessional conduct" may mean to many people, the Court observed, when used in a statute authorizing disciplinary action, the conduct of the teacher must be evaluated in terms of its effect on the welfare of the students, the protection of whom is the concern of the statute. Without the judicial restraint of a requirement that there exist a rational connection between the infringement of the teacher's interest in pursing his profession, and that of the legislative objective in protecting the school community, such broad language would "endow the employing agency with the power to dismiss any employee whose personal, private conduct incurred its disapproval." 461 P.2d at 382.

In a vigorous dissent to the majority holding in Beilan v. Board of Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958), that a teacher's dismissal for refusing to answer a School Superintendent's questions relating to his Communistic affiliations and activities did not violate due process, Justice Douglas, joined by Justice Black, said:

"The fitness of a teacher for her job turns on her devotion to that priesthood, her education, and her performance in the library, in the laboratory, and the classroom, not on her political beliefs." 357 U.S. 399, 415, 78 S.Ct. 1317, 1327.

The Justice then went on to distinguish the situation in which it could be shown that the teacher was organizing a Communist cell in the schoolhouse. Such a teacher, he said, "would plainly be unfit for his job." 357 U.S. 399, 416, 78 S.Ct. 1317, 1327.

A lack of fitness to discharge the required duties has been equated with "incompetency." Black's Law Dictionary, 3rd ed., p. 945; 1 Bouvier's Law Dictionary, Rawle's Third Revision, p. 1528; Random House Dictionary of the English Language, p. 1434.

While a lack of that knowledge necessary to competent instruction, and the inability to convey such knowledge effectively, are both clearly within a commonly understood definition of "incompetency," the cases demonstrate that as a ground for teacher dismissal, the term has been judicially expanded to cover such matters as: the inability to maintain classroom discipline and interest (Tucker v. San Francisco Unified School District, 111 Cal.App.2d 875, 245 P.2d 597 (1953)); corporal punishment of students (Houeye v. St. Helena Parish School Board, 223 La. 966, 67 So.2d 553 (1953)); physical inability to perform the duties of a teacher (Alexander v. Manton Joint Union School Dist., 82 Cal.App. 330, 255 P. 516 (1927)): and prior misconduct (Redcay v. State Board of Education, 130 N.J.L. 369, 33 A.2d 120, aff'd. without op., 131 N.J.L. 326, 36 A.2d 428 (1944)).

The *Redcay* Court in rejecting the argument that incidents occurring prior to the creation of the teaching contract should not be considered in proceedings to dismiss a teacher for unfitness, announced a principle pertinent to the case before us:

"Unfitness for a task is best shown by numerous incidents. Unfitness for a position under the school system is best evidenced by a series of incidents. Unfitness to hold a post might be shown by one incident, if sufficiently flagrant, but it might also be shown by many incidents." 33 A.2d 120, 122.[2]

Finally, we note with approval the standards by which unfitness to teach may be measured, as they were delineated by the California Supreme Court in Morrison v. State Board of Education, supra:

"In determining whether the teacher's conduct thus indicates unfitness to teach the board may consider such matters as the likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blameworthiness of the motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers. These factors are relevant to the extent that they assist the board in determining a teacher's fitness to teach, i. e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the board's standards." 461 P.2d 375, 386, 387.

While it is true that in a Rule 80B review, the Court below was without authority to overrule findings of fact supported by substantial evidence (Laser Frank, formerly Skowhegan Village Shopping Center v. Assessors of Skowhegan and the Inhabitants of the Town of Skowhegan, Me., 329 A.2d 167 (1974)), a misapplication of the law to the facts as found, constitutes reversible error. Larry K. Harlow v. Agway, Inc. &/or Travelers Insurance Company, Me., 327 A.2d 856 (1974).

Applying the principles gleaned from the above decisions to the case now

---

2. In the case at Bar, no claim is made that appellant exhibited "grave lack of judgment" on numerous occasions. Had that been so, we would be compelled to scrutinize such pattern of behavior to determine whether it constituted such "temperamental unfitness" to teach as was discussed in Hopkins v. Bucksport, supra. Temperament is defined as "the unique physical constitution of an individual that *permanently* affects his manner of thinking, feeling, and acting;" (Random House Dictionary of the English Language, p. 1352), i. e., his natural disposition. The isolated act of one who has for 12 years satisfactorily demonstrated his qualifications and suitability for instructing students could not reasonably be the basis of a finding that he was temperamentally unfit to teach.

before us, we find, as a matter of law, that a single, isolated instance of "grave lack of judgment" which does not involve such moral impropriety, professional incompetency, or unsuitability to the discharge of his duties as to undermine "the teacher's future classroom performance and overall impact on his students" does not constitute "unfitness to teach" within the intendment of 20 M.R.S.A. 473(4).[3]

Having found the judgment below to be error as a matter of law, we have no need to reach the other issues raised by appellant.

The entry must be,

Appeal sustained.

DUFRESNE, C. J., and WERNICK, J., concurring.

DELAHANTY, J., dissenting.

WEATHERBEE, J., joined in dissent.

ARCHIBALD, J., concurring separately in majority opinion.

ARCHIBALD, Justice (concurring).

I concur with the result reached in the majority opinion.

My problem lies in the definition ultimately given the statutory language, "unfitness to teach." As I read the majority opinion, this language will, hereafter, be interpreted as *necessarily* incorporating "moral impropriety," or "professional incompetence" or "unsuitability," any one of which must be shown to "undermine the teacher's future classroom performance and overall impact on his students." To that extent I agree with the dissenting opinion that the admonition in Footnote 3

is "dwarfed" by the sweep of the majority opinion. In short, the opinion can be read (as I think it will be) as a limitation on the discretionary right of a school committee to dismiss a teacher for unfitness beyond that which the Legislature intended.

The majority opinion relies strongly on Morrison v. State Board of Education, 1 Cal.3d 214, 82 Cal.Rptr. 175, 461 P.2d 375 (1969). However, it must be remembered that *Morrison* should be read in the context of a California statute.[1] In Maine there is no comparable statute and I believe we overextend ourselves in the area of statutory construction when we interpret our statute, not by our own standards, but by those adopted by a legislature of another state.

I would prefer to interpret our statute by the simple device of giving common meaning to the language used. 1 M.R.S.A. § 72(3).

20 M.R.S.A. § 473(4) permits a school committee to dismiss "any teacher . . . *who proves unfit to teach.*" This is a simple expression couched in ordinary language not necessarily premised on concepts such as immoral conduct.

Initially, the Legislature deemed that dismissal could not be arbitrary but must be based on proof of unfitness. Furthermore, this "proof" must be causally related to the ability of the teacher "to teach," i. e., to instruct, educate, train or discipline, his students. Within this broad concept, the school committee may consider such evidence, or proof, as may exist which has relevance to the ability of a teacher to impart necessary information or skill within his assigned area of teaching so that his students may learn therefrom. He may be dismissed, I believe, only if proof is submitted which rationally supports the conclusion that he is unable to meet this broad standard.

3. We do not mean to say that a single incident can never constitute "unfitness to teach." The facts of each case must be evaluated in terms of whether the character and degree of the act have so impaired the serv-

ices of the teacher in properly instructing his students that he may be said to be incapable of or unsuited to teaching.

1. See *Morrison,* n. 1 at 377.

To revert to the *proof* upon which the defendant committee based its reason for dismissal, the record only shows that the decision was premised on a single incident (other adduced facts being ignored) which the committee viewed in complete isolation. The decision reached did not even reveal the underlying rationale therefor.

Whether evidence exists is a legal question. I am not prepared to hold that a single incident enisled from any educational concept, even though characterized as "a grave lack of judgment," is lawful evidence in and of itself, upon which a school committee can premise a finding of unfitness to teach.

Therefore, I agree that the appeal should be sustained.

DELAHANTY, Justice (dissenting).

I respectfully dissent from the majority opinion on two grounds. First, I cannot accede to the constricted view of "unfitness to teach" advanced by the Court when it holds, as a matter of law, that a single, isolated instance of grave lack of judgment which does not involve such moral impropriety, professional incompetency, or unsuitability to the discharge of his duties as to undermine the teacher's future classroom performance and overall impact on his students does not constitute "unfitness to teach" within the intendment of 20 M.R.S.A. § 473(4). Secondly, the majority barely concedes that any weight attaches to the judgment of the School Committee, either by reason of the Committee's duty to safely administer the schools or by reason of the elaborate record developed by the Committee in support of its conclusions. That the judgment of the School Committee in dismissing the plaintiff may have been harsh does not make the dismissal wrong as a matter of law.

The net effect of the majority opinion is a narrowing of the application of "unfitness to teach" to a teacher's future classroom performance and overall impact on his students. Even though there are grounds for dismissal apparently unrestrained by the classroom-performance overall-impact standards, i. e., moral impropriety, professional incompetency, and unsuitability to the discharge of [teaching] duties, the holding in the instant case makes it clear that a School Committee will not be permitted to form a conclusion as to impropriety, incompetency, or unsuitability unless the Committee can demonstrate an "undermining" of the teacher's future classroom performance and overall impact on his students.

The majority first derives its standards for a teacher's "unfitness" from a series of cases which the majority reads as appearing to require that the teacher's misconduct must in some way impair the teacher-student relationship. From these cases the majority would distill an irrefragable rule, to apply as a matter of law. One case holds that various comments, such as a statement of intention to use political influence, by a teacher seeking to procure a special teaching certificate, would not justify revocation of the teacher's then-existing certificate unless the teacher's conduct amounted to such incompetency in her vocation in and about the school as made her unfit for the position. Browne v. Gear, 21 Wash. 147, 57 P. 359, 360–361 (1899). Two Kentucky cases are also cited as legal authority for the majority holding. In Superintendent of Common Schools v. Taylor, 105 Ky. 387, 49 S.W. 38, 39 (1899), the Kentucky Court of Appeals simply stated that a statute authorizing dismissal of a teacher "for incompetency, neglect of duty, immoral conduct or other disqualification" could not provide jurisdiction for the superintendent to revoke a teacher's certificate, since that drastic step was controlled by a different statute. The statute under which certificates could be revoked did not mention "fitness" or "moral unfitness". The authority of the *Taylor* case as a matter of law is marginal at best. In Bowman v. Ray, 118 Ky. 110, 80 S.W. 516 (1904), the court stated that while a teacher's habitual use of intoxicating liquors could jus-

tify revocation of his teaching certificate under the appropriate statute, the factual allegations were too vague to warrant any connection to his moral character or competency at the time the revocation was sought. Whatever the cogency of this statement, it is of little precedential value as a matter of law, since the *Bowman* court affirmed the revocation on procedural grounds, thereby reducing the court's preceding commentary to dicta.

In my view, the above cases offered as authority by the majority prescribe no controlling rule of law for the instant case. First, they all concern revocation of a teaching certificate, a sanction considerably more serious than dismissal from the school system of one county or one administrative district. Secondly, the teacher's conduct at issue in the above cases did not imperil the safety of students and is therefore far less severe than that charged to the plaintiff in the instant case. Third, there is no mention in the above cases that teacher misconduct consonant with dismissal must in some way impair the teacher-student relationship. I do not read the cases as even appearing to discuss that relationship. Thus, I cannot agree that these cases support the rule advanced by the majority as a legal requirement.

However, in Overstreet v. Lord, 160 Miss. 444, 134 So. 169 (1931), a teacher dismissal statute with language substantially identical to the dismissal statute in the above-discussed Kentucky cases was applied to facts strongly suggesting a single act of grave teacher misconduct. When a teacher went to school knowing that he had smallpox, started to teach his students in class, was restrained by the principal and county health officer, who pointed out that the teacher's condition was highly communicable, and still the teacher insisted on being able to teach, the teacher's dismissal for "incompetency, neglect of duty, immoral conduct, or other disqualification" was upheld. 134 So. at 170–171. The superintendent claimed the legal right to remove the teacher on the ground that the teacher had exposed the school-children to the dangers of the disease. The teacher sought judicial relief by petition for a writ of mandamus. Issuance of the writ was within the discretion of the court, but the court denied the writ on the ground that since the teacher had violated a criminal statute by going abroad in the company of others not having the disease, he was not before the court with clean hands and was not entitled to the writ even if he had been wrongfully dismissed. But the court also stated its opinion that the teacher's conduct was such as authorized his removal from the school. Id. at 170.

I regard the case before us to be much closer in principle to *Overstreet* than to the cases cited by the majority involving revocation of teaching certificates. I do not think it can be denied that plaintiff's grave lack of judgment in leaving a revolver and ammunition in his jacket pockets, in a classroom alcove, unattended by him for part of the day, within reach of students, posed a substantial risk to the well-being of the students and of the entire school community. The risk may not have been as great or sure as smallpox, perhaps, but it was sufficiently real to call into question plaintiff's fitness to teach. Whether the substantiality of the risk bears a material relation to the teacher's fitness to teach is, in a case such as this, a question of judgment initially confided to the School Committee. There is no reason, as a matter of law, why fitness must be judged with specific regard to a teacher's future classroom performance, as the majority holding would require. Even the *Morrison* case, from which the majority adopts the language of its holding, allows for the conduct of the teacher to be evaluated in terms of its effect on the welfare of the students. See Morrison v. State Board of Education, 1 Cal.3d 214, 82 Cal.Rptr. 175, 182, 461 P.2d 375, 382 (1969). Indeed, one court has concluded that the *Morrison* standards for fitness to teach do not measure fitness solely by a teacher's ability to perform the teaching function, and that a teacher's unfitness may derive from reasons

other than his academic proficiency. See In re Grossman, 127 N.J.Super. 13, 316 A. 2d 39, 48–49 (1974). There is respectable authority for the proposition, as a matter of law, that fitness for teaching can depend on a broad range of factors and that a teacher's classroom conduct is neither an exclusive nor necessary basis for determining his fitness. See Beilan v. Board of Public Education, 357 U.S. 399, 406, 78 S. Ct. 1317, 1322, 2 L.Ed.2d 1414, 1420 (1958).

The leading Maine case construing 20 M.R.S.A. § 473(4) stated that unfitness to teach includes moral and temperamental unfitness as well as lack of educational training and ability. Hopkins v. Bucksport, 119 Me. 437, 440, 111 A. 734, 735–736 (1920). The majority seizes upon that statement and urges that temperament, as used in Hopkins, should be read as bespeaking a permanent attribute of an individual's physical constitution. But as I read Hopkins, the plain intention of the Court was to suggest that unfitness to teach could equally well be shown by salient defects of character as well as by inadequacy in professional attributes or qualifications. Though the majority cites Redcay v. State Board of Education, 130 N.J.L. 369, 33 A.2d 120, 122, aff'd, 131 N.J.L. 326, 36 A.2d 428 (1944) as illustrating that unfitness for a task is best shown by a series of incidents, the case stands for no more than the elementary truism that many incidents are a preferable way to prove one's point, but that one incident, if sufficiently flagrant, is enough. 33 A.2d at 122. Though the majority concedes in a footnote that some single incidents, as yet undefined, might appropriately constitute unfitness to teach, the footnote is dwarfed by the majority holding that plaintiff's conduct, as a matter of law, is not sufficiently flagrant to warrant a determination of unfitness. The practical consequence of this holding will be to buttress the contention in future cases that teachers, as a matter of law, are entitled to one aberrant life-imperilling blunder.

The statute construed in Hopkins, and still applicable today, provides only two grounds for dismissal of tenured teachers. Since there is no general language or catch-all phrase in addition to the enumerated grounds of dismissal, it seems essential that the existing grounds be interpreted with sufficient latitude to effectuate the expressed legislative purpose. See Beilan, supra, 357 U.S. at 406–407, 78 S.Ct. at 1322–1323, 2 L.Ed.2d at 1420–1421. The teacher dismissal statute provides elaborate procedural safeguards, which were carefully observed in the instant case. I am unable to agree with the majority when it implies that the School Committee dismissed the plaintiff "in order to calm a fear of its constituency." Such a fear is not a part of the record and may not be assigned without proof as the motive force for the School Committee's action. The observance of due process afforded the teacher ample opportunity to build a record, to point out his enthusiasm for guns, his recent illness, his fatigue, the ice on his car door locks—all of these factors that aparently influence the majority at least to the point of mention, were properly addressed to the School Committee for its consideration. Of the factors considered in the Morrison case, especially factors in mitigation, such as the likelihood of recurrence, the effect of previous service, the significance of the disciplinary action taken, see 461 P.2d at 386–387, these too are initially reposed within the judgment of the School Committee under our statutory procedures. Of course, it is within the competence of this Court to review the legal sufficiency of that judgment. But I do not think we can say there was error before the School Commiteee, or that the School Committee erred in law in concluding that the plaintiff's grave lack of judgment bore a material relation to his fitness as a teacher. They were not obliged to wait till the gun was fired. They are entitled to appreciate the risk to the school community and to act on their appreciation.

Morever, it seems unlikely that the dangers alluded to in *Morrison* will be aggravated by sustaining the dismissal of the plaintiff. See 461 P.2d at 382. "Unfitness to teach" is not such broad language as to endow school committees with the power to dismiss any teacher whose personal conduct incurs their disapproval. It should be emphasized that plaintiff makes no claim that substantive constitutional rights under the First Amendment are infringed by the application of the statutory language of 20 M.R.S.A. § 473(4). See, e. g., Pickering v. Board of Education of Township High School District 205, 391 U.S. 563, 88 S.Ct. 731, 20 L.Ed.2d 811 (1968). Nor is this a case where the school committee has invaded a teacher's privacy and seeks a dismissal on grounds substantially unrelated to and having no material bearing on the teacher's conduct in a professional role as it affects the school community. See, e. g., Jarvella v. Willoughby Eastlake City School District Board of Education, 12 Ohio Misc. 288, 233 N.E.2d 143, 145–146 (1967).

Unfitness to teach is more than an arid abstraction; no attempt to define that phrase with words of fixed meaning can ever succeed. Here, the teacher's conduct manifestly related to the performance of his duties as a teacher. Solicitude and care for the welfare of the students are as much a part of the fitness to teach as a college education or a neat grade book. The School Committee judged plaintiff's care grossly inadequate, and the potential consequences indicative of unfitness to teach. The Committee was entitled, indeed, was responsible, to question the wisdom of allowing the plaintiff to remain entrusted with the daily instruction of youth. That the School Committee chose to apply a severe punishment makes the teacher's conduct neither more, nor less, unfit. The primary decision was theirs to make, and we should not hasten to interpose our judgment as "a matter of law" so long as the dismissal bears a material relation to the teacher's conduct as educator and participant in the school community, and impairs no protected right.

The Superior Court properly sustained the decision of the School Committee. Plaintiff's appeal should be denied.